Good morning. James Ruhm, appearing on behalf of John and Donice Saldana. May it please the Court. I'm here again arguing in front of you on a case that you all have previously decided. And I believe after the Court decided this case, the Court, frankly, made an error in not its factual determination, but its legal analysis of how the facts apply to what it determined. First off — Who made the error? The trial court. Oh, the trial court. I thought you said we did, and I don't know. We're fallible, but — No, I believe, in fact, if you look at your decision in the prior case, as the law of the case, I believe the Court made an error, and I'd like to explain why. The prior case found that the setting of the speed limit was not protected by the discretionary function because there's a Federal statute, regulation of policy, namely the park road standards, that prescribe a course of action for the employees to follow. The park road standards have different minimum stopping distances for this road, and those are contained in the supplemental appendix, but they're also cited in the previous decision in this case. Now, the prior decision said that the setting of the speed limit was circumscribed by objective safety criteria and was the result of a policy decision, not the kind protected by the discretionary function. And as stated therein, a setting of a speed limit of 35 miles an hour is only allowed when the stopping site distance meets or exceeds 225 feet. In this case, the Court correctly, I believe, found that the stopping site distance provided was 175 feet. The only — the highest speed limit that would be compliant with is 25 miles per hour. Now, the Court, in spite of that, found that the government was not negligent in setting the speed limit at 35 miles per hour. Counsel, let me ask you this. There's supposed to be a brief period before you can kind of process in your brain what you're seeing, and is it one-and-a-half or two-and-a-half seconds? I believe one-and-a-half seconds is what the Court found, and I'm perfectly fine living with that perception-decision-reaction time. Well, now, in your brief, you say that the expert for the government conceded that two-and-a-half was what was set forth in the standards. In fact, I believe he did, but I'm not going to challenge the trial court's decision of the facts. I'd rather challenge his analysis of the laws he applied to those facts here today. In fact, with respect to that, and I believe, although I don't typically ask a court of appeals to look at exhibits that were presented before the trial court, I think in this case it is helpful to look at what was actually there, what actually happened on the day of the accident. Do you agree that if he had applied the brakes appropriately, he would have stopped far short of the van? Well, I disagree with appropriately. Frankly, if he – the testimony was if he applied the brakes hard and continued to hold them hard down and was able to do that, he would have stopped far short of the van. I do not dispute that at all. But what I do dispute is the idea that Mr. Saldana was not presented with a situation of imminent peril. He was a – it's undisputed that he was going 30 miles an hour, less than what was called for, more than the 25-mile-per-hour speed limit, which would have been proper given the sight line 175 feet, less than the 35 miles per hour, which is contemplated by the minimum stopping sight distance in the park road standards. Well, I'm trying to sort out what your theory is, because if you – you start out with the standards, the standard says 35 miles an hour. The testimony and the facts accepted are that Mr. Saldana was going 30 miles an hour. He knows the road. I mean, this is not the first time he's been on it. So your expert said that the way to accommodate this dangerous sight was a combination of signage and the speed limit. He said if you put it at 25 miles an hour, people aren't going to believe it because the curve isn't that sharp a curve, so you're going to have to put up a sign. Now, we, in our opinion, originally concluded that signage was much more discretionary and was subject to the discretionary function. So the thing that I'm trying to figure out is, ultimately, applied to this accident, what is your theory? The fact of the matter is that even though the speed limit was set at 35, Mr. Saldana, either because he knew it was dangerous or for whatever reason, said he was going five miles below the speed limit. So he knew there was a turnout there, so – presumably because he's gone by there, you know, many, many times. So what is it that the – what are you – what law are you asking us to apply that's going to override the facts on the ground? Well, I believe the law I'm asking you to apply is that the speed limit should have been set at 25, and that I believe the testimony – and I think it's undisputed that Mr. Saldana was following the law, was going less than the speed limit, but it's also an issue that a lay person on a – on a motorcycle is not going to know how much stopping distance he needs. Mr. Saldana had never seen a stopped vehicle here before. There's no question about that. If he'd been going 25 miles per hour, the testimony is he would have been able to stop in time. He would not have needed to apply the brakes in sort of an emergency fashion, which he did here, which caused him to lose control of his – almost lose control of his motorcycle, and then attempt to avoid the vehicle in front of him by going around it. I believe the – what happened here is the – the fact that this – that the speed limit on this road was 35 miles per hour, and Mr. Saldana was prudently taking what was a blind curve at somewhat slower than the speed limit, I believe the speed limit needed to be down to 25 miles per hour, and it needed to be enforced, and it needed – regardless of whether or not a sign was there, if it was – if that was the speed limit and Mr. Saldana was driving the speed limit, as I assume he would be, as any prudent person would do, he would have been able to stop when he came around this curve and saw this car stopped in front of him. Instead, he's presented with a situation where he's 175 feet, he's going 30 miles an hour. At the time he even – I'm sorry. The problem – I think it was in Kobayashi, your expert, isn't he the one that said it would have to be 25 plus a sign because people would not obey 25 miles per hour unless they knew the reason for it. And what I was trying to get at is that in your case with Mr. Saldana, he presumably knew the – would have known the reason. He knows that there is a – he knows the nature of the curve and that there's a – now, whether he would have known somebody be stopping for the left turn, but, you know, you go in out of Yosemite and there are those turnouts, and, you know. I understand that, but my – well, yes, Mr. Kobayashi. So if you posted it at 25, your expert says they would have needed a sign. The sign was to let you know, really, what the problem – the blind curve or the potential hazard there. And yet Mr. Saldana seems to be the atypical person who knows that there is this circumstance there and he slowed down. He just didn't slow down enough. So your theory is that if they had put it at 25, he, as an observant person, would have been going 25. That's ultimately your theory. That is my theory. And I believe that Mr. Kobayashi did testify to that. However, he's not our traffic engineer. He is the accident reconstructionist. Is he your expert or the other side's? He was my expert. But he was not – he, in fact, was not the one to testify about that. Mr. Shields was. Mr. Shields testified that the speed should be set at 25 miles per hour, and every expert in the case testified that different things could be done to enforce that speed limit. The problem here is by setting a speed limit of 35, you're – you're impliedly telling the people that it's safe to drive 35. It's not safe to drive 35. It's – it's only safe to drive 25 miles an hour. That is the – that is the simple fact of the matter. The government, by setting the speed limit, has created a dangerous condition on the road. They are telling people – Kennedy, what's the law that mandates that? What's the law that mandates the – You said the law should override, you know, should – as applied to the facts. I believe – The law mandates that it has to be 35. 25. 25. Excuse me. It has to be 25. I believe the Park Road standards set the standard of care as previously addressed by this – this Court in the prior decision in this case. That when they fail to set a safe speed limit, as they have in this case, do not comply with their own standards, the government should be held liable, should be found to be negligent in doing those actions. And then Mr. Soldano's reasonable response to that, which is to break and then attempt to stop, only – only to fail to do so because of his over – overzealousness in breaking, and then his attempt to escape what was a dangerous situation, caused the accident, and the government should be held liable. But does the record show whether the Wang van had its left turn signal, lane change warning signal going? To my knowledge, it does not. My time is up. I'll be happy to answer any more questions. We'll give you some time on rebuttal, so. Thank you very much. You can answer them now. Good morning, Your Honors. Brian Enos, appearing on behalf of the United States. At the outset of my presentation today, demonstrating why the trial court's decision needs to be affirmed in its entirety, I'd like to make two critical points. One, both plaintiff's negligence claim at trial, as well as their imminent peril challenge within this appeal, are both reliant on Judge O'Neill's judgment with respect to who caused the dangerous condition leading up to the accident. As we all know, Judge O'Neill determined that the United States did not indeed create this dangerous situation. Two, and I think plaintiff's counsel – Tell me why he says that. Why – why does Judge O'Neill say that? Yes. Well, okay. Plaintiffs don't appeal that, and that's a critical point here. I'll nevertheless tell you why he says that, and that's based on the facts. The facts in this matter are largely uniform. Both accident reconstructionists testified that Mr. Saldano had plenty of space to completely stop his vehicle preceding the weighing van in front of him. And just to address a brief point with Your Honor, I – That isn't really my question or your statement. The standards would indicate that the speed limit should be 25. The park road standards indeed have table 6, and I believe that's supplemental excerpt of record page 17, if my memory serves. And that is a mere – according to Judge O'Neill, it's pursuant to him finding Ed Ruzak, the government's roadway engineer, to be more credible than Mr. Shields, and following the reasoning of Mr. Ruzak as just being guidelines, not mandatory. Now, this was adopted by APA rulemaking. Notice? I'm sorry? These regulations were adopted by APA rulemaking. They gave notice, public comment, and then formally adopted them. Now, I don't see how those can be other than the standards. Well, what we don't have here – we've got two responses to that, Your Honor – is any indication that there's any legal mandate underlying these standards. The standards do say on page 1 that they – or I will say they refer to 23 U.S.C. 402, which has to do with highway construction and the like. Neither that statute or the standards say here's the minimum legal allowable site distance that's appropriate for certain roads. So we don't have any evidence showing whether Table 6 is indeed the minimum legal allowance for site distance or if it's some safer allowance. And it's important to note that Table 6 also contemplates a worst-case scenario, if you will. The accident in question underlying this lawsuit happened in June, near noontime, clear day, dry roads, clear visibility. The park road standards contemplate wet roads and significantly a 6-inch-high object that you need to be able to see within a certain distance. Here what we have is the entire backside of a minivan, and you can see precisely how much of the minivan was available to Mr. Saldano's sightline. On page 7 of the supplemental excerpt of record, specifically the government's expert's picture identified by 3.4 seconds, and he did that at how much time if he continued to travel 35 miles an hour from the point of the picture to the point of impact. So what Judge O'Neill did was twofold. First of all, he looked at the facts of the case, and both experts, it's important, both roadway construction experts agree that both the curvature and the geometrics of the road in question is appropriate for 35 miles an hour. Mr. Ruzak also testified that there are no legal mandates in support of the park road standards, but nevertheless they're just guidelines. He also determined that given the sightline available, that that was plenty of distance for that speed limit. And it's important to remember, as I believe was brought up earlier, the actual speed that Mr. Saldano was traveling was 30 miles an hour, not 35. And so he had even the longer space available to him by which to stop, as evidenced by Mr. Castaneda's 64 to 69 feet of distance between a complete stop and the back of the bumper in front of him, to be distinguished from Mr. Kobayashi's 48 feet. But Mr. Kobayashi's determination was based on a full 35 mile an hour speed, hence it would take more distance to completely stop. So what Judge O'Neill did was analyze the facts of this case. He also deemed Mr. Ruzak to be more credible. And I know through case law that's cited in the brief that the Ninth Circuit's particularly reticent to cast aspersions on credibility findings by the trier of fact to indeed make his determination that the speed limiting question indeed was not a substantial factor in causing this accident. So what the government has here is two lines in the sand, if you will. First of all, and I believe Mr. Rumb said this morning, they're not challenging the facts of this case. So what they're not doing is challenging Judge O'Neill's causation determination based on the facts of this case. Since that argument's waived, regardless of the outcome of the standard of care issue, the decision must be affirmed because there's no challenge to the causation determination that Mr. Rumb made. Even if there was a factual challenge, as discussed in both the brief and earlier components of this oral argument, the facts clearly show that Judge O'Neill was not clearly erroneous with respect to any component of his analysis, either the standard of care or causation. He never made a determination for sure as to whether this was an imminent peril. If it were an imminent peril, did he apply the right standard? He did. There's a – and let me back up a little bit. First of all, Judge O'Neill made a two-pronged decision with respect to imminent peril. First, he determined there was no imminent peril based on his same causation analysis in analyzing the facts of the case. In short, Mr. Saldano had plenty of time, plenty of space by which to safely stop behind the van in front of him. He said alternatively, even if there were an imminent peril, the peril was created by Mr. Saldano, not by the United States speed limit. And that, again, is based on the causation analysis he made. And it's important to consider that jury instruction 4.40, which the plaintiffs cite in support of their imminent peril claim, says so long as the person harmed doesn't create the hazardous condition through his or her own negligence, then this lower standard of care applies, i.e., what does an ordinary person do in this imminently perilous situation? So Judge O'Neill's alternative argument or conclusion with respect to imminent peril, and the correct one was, it doesn't apply because Mr. Saldano created the hazardous situation by turning into what I deem is the Bermuda Triangle of bad places to be. Not only did the weighing van attempt to turn and cross into the oncoming traffic onto the lookout, but the Chen van was approaching from the other side, which ultimately collided with Mr. Saldano. And there was a third van. All these cars are indicated in Supplemental Excerpt of Record, page 7, that was looking to turn from the lookout onto the eastbound lane. So Mr. Saldano picked, unfortunately, and it's a tragic accident, he picked the worst thing to do, and that is to try to swerve across the double lines into where all three of these cars, within a matter of a few seconds, were going to be. But his theory is that he didn't create the circumstance that forced him to make the split-second decision, and one of the experts on your side, I think, said, well, the worst that would have happened, he would have collided gently or, you know, modest collision with the rear of the van. Well, that's 20-20 hindsight. If you're on a motorcycle, you're literally between a rock and a hard place. The idea that he created the danger by swerving to avoid, you know, a known collision is somewhat troublesome. Well, I think what the ‑‑ if it was our expert that said that, it would have been Castaneda, who was our accident reconstructionist. And what he ‑‑ if he ‑‑ I don't recall that being that clear during trial, but if he did, it was going to be, hey, if Mr. Saldano had not continued to apply the brakes as he should have, and he easily could have, and he took an extra 69 feet 1 inch, then, indeed, he would have bumped into the van in front of him. So it was an alternative statement that we would have made in the record, and I apologize for not clearly recalling that statement. But nevertheless, it still assumes that he was not being sufficiently careful on his own end by simply just applying the brakes and stopping with a full 22 to 24 yards of space in front of him between him and the white van. Was there any disputed evidence as to what the plaintiff could see? Could the plaintiff have seen the third van or the other van that was waiting to come out? Or was he far enough into the corner? I mean, was the corner too secure for him to see anything? The answer to that question, Your Honor, is yes, he could have seen the van from the lookout waiting to turn back onto the road, as well as the van from the westbound lane waiting to turn onto the lookout, as evidenced on supplemental excerpt of record. I believe it's page 7. There's four photographs on there. The one that identifies the 3.4 seconds is the one that the testimony reveals, what Mr. Saldano actually saw at the 175 feet. I'd like to note just a small irony here. It's actually the government's expert that determined the shorter 175-foot sight distance. It was the plaintiff's expert that determined the longer 180-foot sight distance. So there's really not a significant dispute with respect to how much ahead of him Mr. Saldano indeed could see before the turnout point. To the extent there is a dispute, it's the government's witness that helps plaintiff out a little bit more. But to answer your question, yes, he could indeed see the vehicle from the turnout point waiting to turn eastbound into the lane. Okay. Thank you very much for your argument. Thank you. I'll give you a couple of minutes on rebuttal. I appreciate it. Your Honor Can you address the causation issue? It's been said you don't appeal that issue. So where does that leave the record? I do appeal the causation issue because I believe the imminent peril requires that causation be found against the government. Your Honor brought up an excellent point, which is not that they're expert. In fact, the trial judge in the trial decision found that Mr. Saldano would have hit or could have hit the vehicle at a slow speed. He said that's the worst that would have happened. Then in that case where he could have hit it, Mr. Saldano doesn't know what the consequences of that are going to be. He doesn't know how injured he's going to be from hitting it. He's on a motorcycle. He's not on another vehicle. He makes an instinctive effort to escape. I believe that in doing so, this falls directly under the imminent peril second prong, which is that when faced with this situation of imminent peril, when that instinctive effort to escape is made, even if it turns out had he done the other thing, he wouldn't have been harmed, which we don't know. In fact, the judge says he might have ended up hitting the van. We don't know what would have been caused from that. It would have been a low-impact accident. This apparent imminent peril, he then makes this decision to escape. He's not held liable for doing that. In fact, the government must be. Well, no, wait a minute. You say the government. But the question is, there were several actors in this scenario. It wasn't just the government. The government was not present except in what it failed to do. The van that was there, if you have a rear-end collision, there's typically a dispute between who's at fault, the person coming from behind or the person who gets hit from behind. So in this case, the van created, the parked van making a turn across a double yellow line was certainly one actor. And I think in your brief, you make reference to that being part of the government. But they're not a party in this lawsuit, are they? They were a party to this lawsuit. They're not now. They're no longer a party. So the question is, does under the imminent peril doctrine, does that wind up shifting responsibility back to the government? Or would it just simply shift responsibility onto the van? I believe it could shift responsibility either way. But certainly I believe the government must be found to be a cause, as called for under that imminent peril jury instruction, because the government is the one that created the situation where they knew there was a turnout, that vehicles could be stopped, and then set a speed limit that was too high for the road. And the too high comes from what? Just from the fact of the standard. From the standard itself. But none of the experts said it was too high. That's not true. In fact, our experts did say it was too high. It's a question of whether or not he could have stopped. That's more of a causation issue as opposed to a liability, a negligence question. I believe everyone agrees that it's too high for the standards. Given the facts of what was out there, Mr. Saldano, if he had braked perfectly, he could have stopped. We're not saying any differently. We're saying when presented with this situation where he faces an imminent peril, a van directly in front of him stopped, that the defendant's own expert acknowledges that this van could be an imminent peril. In fact, Mr. Ruzak, defendant's expert at Excerpt of Record, page 342, lines 12 to 16, acknowledges that this van could be an imminent peril to him. Now, whether or not the van is responsible, what percentage of responsibility is government versus the van, maybe that's a question to go back to the trial court, but I believe the government is a cause of the accident. Okay. Now I understand your argument. All right. Thank you very much. Thank you. We appreciate the argument. It's submitted and will be in adjournment. Thank you.
judges: Goodwin, B. Fletcher, Fisher, Cjj